Filed 1/23/15  In re William G. CA5

NOT TO BE PUBLISHED IN THE OFFICAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re WILLIAM G., a Person Coming Under the Juvenile Court Law. | |
| KINGS COUNTY HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARTHA G.,<br><br>    Defendant and Appellant. | F069413<br><br>(Super. Ct. No. 11JD0052)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Jennifer Giuliani, Judge.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Colleen Carson, County Counsel, Risé A. Donlon, Deputy County Counsel for Plaintiff and Respondent.

-ooOoo-

Martha G. (mother) appeals a judgment terminating parental rights to her son, William G., under Welfare and Institutions Code section 366.26.[1]  She contends there is not substantial evidence to support the finding William is likely to be adopted within a reasonable time.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

This dependency case began in August 2011 when the Kings County Human Services Agency (Agency) removed William (born in August 2010) and his half-brother, Victor (born in June 2009) (collectively the boys), from their mother's custody because she was not caring for them properly and was arrested for willful cruelty to a child.  In September 2011, dependency jurisdiction was taken over the boys, who were placed in foster care while mother was provided family reunification services.  At the six-month review hearing in March 2012, the boys were returned to mother's care and family maintenance services were ordered for mother and the boys, as well as for William's father and William.[2]

On July 3, 2012, the Agency filed a section 387 supplemental petition for a more restrictive placement.  The Agency alleged that the previous disposition placing the boys with mother had not been effective as mother failed to comply with her family maintenance case plan when (1) she failed to attend her mental health appointments in June; (2) William missed two appointments at UCP in June; (3) mother twice denied Agency staff access to her home; and (4) she allowed her sister to live in the home without Agency approval.  The Agency removed the boys from mother's care; William was placed with his father, while Victor was placed in foster care.  The Agency

---

[1]Undesignated statutory references are to the Welfare and Institutions Code.

[2]Mother's family maintenance case plan required her to (1) attend mental health appointments twice per month; (2) ensure the boys attend all medical, dental, Central Valley Regional Center (Regional Center) and United Cerebral Palsy (UCP) appointments; (3) allow monthly home visits by the social worker; and (4) not allow any adult to live in the home without the Agency's prior approval.

2.

recommended that William remain with his father under a plan of family maintenance, that Victor be placed in foster care, and that mother be offered family reunification services. At the detention hearing, the juvenile court adopted the Agency's placement recommendations.

In the report prepared for the jurisdictional and dispositional hearings filed on August 7, 2012, the Agency recommended that mother not be provided further reunification services pursuant to section 361.5, subdivision (a)(1)(B), as she had received more than six months of services; that the juvenile court set a section 366.26 hearing on Victor's behalf; and that dependency jurisdiction over William be terminated and his father granted sole legal and physical custody of William. The report explained that both boys had been receiving services through the Regional Center since September 2011; William was being followed for possible development delays, with current diagnoses of Dandy-Walker Malformation, Genu Varum, and possible mega-cisterna magna—an enlarged skull. William had an appointment with the orthopedic clinic at Children's Hospital Central California (CHCC) on September 4, 2012. Neither boy was in need of, or receiving, mental health services

Following a contested jurisdictional hearing held in August 2012, the juvenile court found the petition's allegations true. Before the dispositional hearing, William's father told the Agency he was no longer willing to provide a home for William as he was unable to provide William primary care, and his wife was no longer willing to do so; William's father asked that William be removed and adopted. Consequently, the Agency requested the juvenile court to remove William from the care of both parents and set a section 366.26 hearing on both boys to determine the most appropriate permanent plan for them. At the conclusion of the contested dispositional hearing, the juvenile court removed the boys from the physical custody of their parents, ordered that neither mother nor William's father receive reunification services, and set a section 366.26 hearing for January 2013.

3.

On December 4, 2012, the juvenile court granted the Agency's ex parte application allowing medical staff at CHCC to perform a magnetic resonance imaging (MRI) on William's head to evaluate him for possible Dandy-Walker Syndrome, a congenital brain malformation involving the cerebellum and the fluid-filled spaces around it. The social worker explained in the application that a pediatric neurology specialist, Dr. Paul Fleenor, saw William on November 14, 2012, and requested the MRI due to William's medical history, which showed that, while William was diagnosed prenatally as having Dandy-Walker, it was never formally diagnosed. The MRI was scheduled for December 31, 2012.

On December 20, 2012, the Agency filed its report for the section 366.26 hearing, in which it recommended the permanent plan of long-term foster care for the boys. At that time, the boys were placed in separate foster homes; William had been in his home since he was removed from his father's custody in September 2012 and was adjusting well, while Victor had been in three homes since he was removed from his mother in July 2012.

The social worker reported that no issues were noted at William's most recent physical examination on December 17, 2012. According to the substitute care provider, William had no visible dental problems and was not in need of dental care. William was seen at the CHCC orthopedics department on March 5, 2012, when he was prescribed orthopedic shoes for "in-toeing," and had a follow-up appointment on January 2, 2013. The social worker noted Dr. Fleenor was evaluating William for possible Dandy-Walker Syndrome and that the juvenile court had authorized an MRI, which was scheduled on December 31, 2012.

William was a Regional Center client; he became eligible for Early Start services based on delays in his gross motor skills and concerns about his expressive language and fine motor skills. William was receiving Early Start services through the Regional Center

and UCP once a week.[3]  The substitute care provider reported that William had made great progress in his expressive language and fine motor skills; William's vocabulary had grown and he was able to put two-to-three words together to form a sentence.  William would answer and reply to his name and understood exclamatory expressions.  In addition, he was able to walk on his own, reach and grasp things, and pick up toys and throw them.  William was not receiving mental health services; the substitute care providers did not believe William was in need of services as he appeared to be doing well and demonstrated no emotional or behavioral issues.

An adoption referral was submitted on the boys' behalf on September 26, 2012.  An adoption specialist completed an adoptive assessment and determined that adoption and guardianship were not appropriate permanent plans for the boys at the time, as the boys were not considered "generally adoptable children" due to possible medical and developmental concerns, and no family willing to adopt or assume guardianship had been identified.  William's substitute care providers, however, wanted more time to assess his conditions and functioning before considering adoption, and relatives who were considering adoption were being evaluated for placement.  Therefore, it appeared long-term foster care with the goal of adoption would be an appropriate permanent plan.  At a December 5, 2012 meeting, it was determined the boys were not appropriate for adoptive planning.

At the January 8, 2013 section 366.26 hearing, the juvenile court found it not likely the boys would be adopted if parental rights were terminated.  The juvenile court ordered the boys to remain in foster care with the specific goal of adoption and set a review hearing for June 18, 2013.

In a status review report filed on June 3, 2013, the Agency recommended the permanent plan of long-term foster care continue, as the boys were not good candidates

---

[3]According to an Agency social worker, William does not have cerebral palsy; he received services at UCP for his motor development.

5.

for adoption and no one was willing to commit to guardianship at that time. William remained in the same foster care placement, where he was doing well and had made significant progress in his speech development, while Victor had been moved to another foster home due to his behavioral issues, which included being very defiant, having extreme tantrums, and being destructive. No medical concerns were noted for William, who was receiving physical therapy once a month at CHCC due to his in-toeing. The maternal great-uncle and -aunt (the relatives) were being assessed for placement of both boys; in May 2013, the relatives started visiting the boys once a month to establish a relationship with them before making a final decision. The relatives eventually wanted to adopt the boys. At the June 18, 2013 hearing, the juvenile court ordered that the boys remain dependents and remain in foster care, with the specific goal of placement with a relative, and set a review hearing for December 10, 2013.

In a status review report filed on November 27, 2013, the Agency recommended that a section 366.26 hearing be set to determine a permanent plan for the boys, as the relatives wanted to adopt them. Victor had been in the relatives' home since June 28, 2013, while William had been there since July 29, 2013. The boys had adjusted well to their placement and made significant progress; Victor's behavioral issues had resolved, the boys got along very well, and the relatives reported the boys were doing well and had not reported any issues or concerns. The boys referred to the relatives as "mommy" and "daddy," and appeared to have an attachment with them as evident in their interactions.

William was due for physical and dental examinations, which the relatives were going to arrange. While William had been receiving Early Start services from the Regional Center, when he turned three he was reassessed for service eligibility; a full psychological evaluation indicated he no longer qualified for Regional Center services under The Lanterman Developmental Disabilities Services Act, sections 4500 et seq., eligibility criteria. However, William did qualify for an individualized educational plan (IEP) with the Kings County Office of Education. The relatives, who lived in Fresno

County, were working with the Fresno County Office of Education to obtain speech and language services for William. On November 8, 2013, the social worker referred William to Kings County Behavioral Health for a developmental screening.

At the December 10, 2013 review hearing, the juvenile court set a section 366.26 hearing for April 2, 2014. In February 2014, Victor was removed from the relatives' home, at their request, due to ongoing behavioral problems, and placed in a foster home. In a report prepared for the section 366.26 hearing, the Agency recommended termination of parental rights and a permanent plan of adoption for William. The social worker explained that William was a healthy three-year-old child with no severe developmental or medical problems, and thus was an excellent candidate for adoption. Moreover, William was placed with the relatives, who were committed to adopting him if parental rights were terminated.

William was current on his physical examinations and immunizations. His last physical was on June 20, 2013; no medical concerns were noted. William was scheduled for a dental examination, which the relatives were in the process of scheduling. William continued to wear orthopedic shoes and receive monthly physical therapy for his in-toeing. He was receiving weekly speech therapy at home through the Fresno County Office of Education to address his speech delays. William had not shown any behaviors indicative of mental health or emotional concerns.

The social worker noted that, while William had been diagnosed with some developmental delays in his language and motor skills, the delays were being addressed and the relatives were committed to adopting him. Adoption services felt it was in William's best interest to have a stable, nurturing, permanent family through adoption, and therefore adoption appeared to be the most appropriate permanent plan.

A preliminary adoption assessment of the relatives had been completed in compliance with section 361.5, subdivision (g)(1), which indicated the relatives appeared suitable to adopt William. William had lived in their home since July 29, 2013, and

continued to thrive there. The emotional attachment between the relatives and William was growing; the relatives were diligent in ensuring William received the ongoing love, support, and guidance to ensure his emotional and physical development; and the relatives were committed to providing William with a loving permanent family home under the plan of adoption. The Agency investigated and cleared the relatives' backgrounds and approved them for relative placement. The relatives wanted to adopt William because "he is family" and they love him. They wanted William to remain with family, had grown to love him, and wished to provide him with a loving, permanent home.

The social worker reported the relatives were able to meet William's needs as they had cared for him for the past seven months; William continued to thrive in their home; and they were committed to caring for William long term. They understood their responsibilities in adopting William and knew they would be fully responsible for him until he reaches the age of 18. They were willing to do so and keep William safe.

At the April 2, 2014 hearing, at which mother appeared, the juvenile court noted the Agency's recommendation for William was adoption while Victor's recommendation was for a permanent plan of long-term foster care. While mother was willing to submit on Victor's matter, she wanted a contested hearing regarding the recommendation for William. Accordingly, the juvenile court made findings and orders as to Victor, finding it not likely he would be adopted if parental rights were terminated, and continuing him in foster care with a permanency goal of independent living. The court set a contested hearing regarding William for April 29, 2014.

When mother failed to appear at the April 29 hearing, her attorney withdrew the request for a contest and submitted. The juvenile court read, reviewed, and considered the March 18, 2014, selection and implementation report, which it accepted into evidence. The juvenile court noted mother was present at the April 2 hearing, when she was ordered to appear on April 29, and admonished that the court could make orders in

her absence if she failed to appear. The juvenile court stated it found by clear and convincing evidence it was likely William would be adopted and adopted the Agency's proposed findings and orders.

## *DISCUSSION*

Mother argues there is not substantial evidence to support the juvenile court's finding that William was likely to be adopted within a reasonable time if parental rights were terminated. (§ 366.26, subd. (c)(1).) Relying on *In re Valerie W.* (2008) 162 Cal.App.4th 1 (*Valerie W.*), mother argues the Agency's assessment does not constitute substantial evidence of adoptability because the assessment report did not mention the results of William's court-ordered MRI for Dandy-Walker Syndrome, reference that syndrome, or indicate that the relatives had been advised William had the condition. Under these circumstances, mother contends William is not either generally or specifically adoptable. According to mother, any analysis of the likelihood of William's adoption depended solely on the relatives' desire to adopt him, which cannot support such a finding due to the inadequate report.

When the juvenile court refers a case to a section 366.26 hearing, it is statutorily required to direct the Agency to prepare an assessment report of the child as part of its report to the court. (*Valerie W., supra,* 162 Cal.App.4th at p. 11.) The assessment report must address the child's medical, developmental, scholastic, mental, and emotional status; analyze the likelihood the child will be adopted if parental rights are terminated; describe the efforts made to identify a prospective adoptive parent or legal guardian for the child; and provide a preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian. (§ 366.21, subd. (g)(1); *Valerie W., supra,* at pp. 11-12.) "The assessment report is 'a cornerstone of the evidentiary structure' upon which the court, the parents and the child are entitled to rely." (*Valerie W., supra,* at p. 11, quoting *In re Crystal J.* (1993) 12 Cal.App.4th 407, 413.)

Here, mother contends the assessment report was inadequate because it failed to disclose the results of the MRI, mention that William had been diagnosed with Dandy-Walker Syndrome, or indicate the relatives were advised of the condition. Mother, however, did not challenge the adoption assessment in the juvenile court on any grounds, let alone the grounds she now raises. While on appeal mother may challenge the sufficiency of the evidence supporting the adoptability finding, she has forfeited any objection to the adoption assessment by failing to raise it below. (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1317 (*A.A.*).)

The case mother relies on, *Valerie W.*, does not compel a different result. There, the Court of Appeal determined an assessment was statutorily inadequate because it not only inadequately assessed a child's medical condition, it also failed to consider whether one of the children's caregivers was qualified to adopt them and whether there was a legal impediment to joint adoption. (*Valerie W.*, *supra*, 162 Cal.App.4th at p. 4.) The inadequate report, which the appellant challenged in the juvenile court, resulted in a conclusion that substantial evidence did not support an adoptability finding. (*Id.* at p. 7; see *A.A.*, *supra*, 167 Cal.App.4th at p. 1317.) In contrast here, mother did not challenge the adequacy of the report in the juvenile court. Consequently, *Valerie W.* does not persuade us to consider mother's criticisms for the first time on appeal.

Instead, we turn to whether substantial evidence supports the juvenile court's adoptability finding. In order to terminate parental rights, the juvenile court must find by clear and convincing evidence the child is likely to be adopted. (§ 366.26, subd. (c)(1).) A finding of adoptability requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406 (*Zeth S.*).) The question of adoptability usually focuses on whether the child's age, physical condition, and emotional health make it difficult to find a person willing to adopt that child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) "To be considered adoptable, a [child] need not be in a prospective adoptive home and there need not be a

prospective adoptive parent "'waiting in the wings.'" [Citation.] Nevertheless, 'the fact that a prospective adoptive parent has expressed interest in adopting the [child] is evidence that the [child's] age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*.'" (*In re R.C.* (2008) 169 Cal.App.4th 486, 491 (*R.C.*).)

If the child is adoptable, there is a strong preference for adoption over alternative permanency plans. (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 808-809.) If the court determines that the child is likely to be adopted within a reasonable time, the court is required to terminate parental rights unless the parent shows that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)(A) and (B). (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343-1345.)

On appeal, we review the juvenile court's finding that a child is adoptable for substantial evidence. (*R.C.*, *supra*, 169 Cal.App.4th at pp. 486, 491.) "[O]ur task is to determine whether there is substantial evidence from which a reasonable trier of fact could find, by clear and convincing evidence, that the minor is adoptable. [Citation.] The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order." (*Id.* at p. 491.)

Mother's argument that the children are neither generally nor specifically adoptable obfuscates the adoptability issue before the juvenile court.[4] As this court

_____

[4]When assessing adoptability, courts have divided children into two categories: A child is "generally adoptable" if the child's traits, e.g., age, physical condition, mental state, and other relevant factors, do not make it difficult to find an adoptive parent; a child is "specifically adoptable" if the child is adoptable only because of a specific caregiver's willingness to adopt. (*R.C.*, *supra*, 169 Cal.App.4th at pp. 492-494.)

11.

explained in *In re G.M.* (2010) 181 Cal.App.4th 552, 562, not all dependency cases fall neatly into one of two scenarios: one, where the availability of a prospective adoptive parent is *not a factor whatsoever* in a social worker's adoptability assessment, or two, where a child is likely to be adopted *based solely* on the existence of a prospective adoptive parent. As we explained: "These scenarios represent opposite ends on the continuum of when a child is likely to be adopted. However, many adoption assessments that recommend an adoptability finding fall somewhere in the middle. They consist of a combination of factors warranting an adoptability finding, including, as in this case, the availability of a prospective adoptive parent. This is the reality we confront, notwithstanding appellate arguments that assume a child is either generally adoptable without regard to a prospective adoptive parent or specifically adoptable based solely on the availability of a prospective adoptive parent." (*Ibid.*)

Here, the record discloses substantial evidence, as detailed above, of William's adoptability, notwithstanding the "general" or "specific" labels mother urges. William was young—three years old—and did not have any medical concerns, emotional problems, or behavioral issues. While there were concerns about William's development, such as his speech delay and weak motor skills, and his in-toeing, his delays and medical condition were not severe and were being addressed with appropriate interventions, and he was improving to the point where he was no longer eligible for Regional Center services. The relatives, who had been caring for him for at least eight months, had grown to love William, who called them "mommy" and "daddy," and were committed to adopting him notwithstanding these diagnoses. Thus, there was evidence before the court that his characteristics did not make it difficult to find an adoptive family for him.

Mother presumes the juvenile court's adoptability finding was based solely on the relatives' willingness to adopt. She contends their willingness cannot support this finding due to the Agency's failure to disclose information concerning Dandy-Walker Syndrome. Comparing this case to *In re Jerome D.* (2000) 84 Cal.App.4th 1200 (*Jerome D.*) and *In*

*re Jayson T.* (2002) 97 Cal.App.4th 75 (*Jayson T.*),[5] she argues the evidence was too weak to meet the clear-and-convincing standard of adoptability, and the juvenile court failed to consider the "very real possibility of a failed adoption" due to the lack of evidence of medical testing, as well as the failure to disclose the condition to the relatives. She asserts there is no assurance the relatives will have the ability, or even the desire, to meet William's needs once they have been disclosed.

The record is silent on whether the relatives were apprised that William had been diagnosed prenatally with Dandy-Walker Syndrome or of the results of the MRI. While mother paints it as a certainty that William has Dandy-Walker Syndrome, that is far from clear. The neurologist recommended the MRI because the diagnosis had not been formally made. Although the Agency did not report the results of the MRI, the record shows the relatives were responsible for arranging William's medical and dental examinations, and presumably took him to them, and no medical concerns were noted. To assume that William was formally diagnosed, yet the diagnosis never revealed, requires us to engage in pure speculation. Mother never raised her concerns in the juvenile court, where both her concerns and their legal significance, if any, to the issue of William's adoptability could have been litigated. By arguing them now, mother asks this court to reweigh the evidence and draw questionable inferences on conflicting, or nonexisting, evidence. Such second guessing is not within our appellate authority. (*In re Laura F.* (1983) 33 Cal.3d 826, 833 ["our task is not to reweigh the evidence or to express an independent judgment thereon but merely to decide whether there is sufficient evidence to support the findings of the [juvenile] court"].)

In support of her contention that the juvenile court lacked sufficient information to determine William's adoptability, mother cites *In re Brian P.* (2002) 99 Cal.App.4th 616, a termination-of-parental-rights case resulting in a reversal on the finding of adoptability.

---

[5] *Jayson T.* was disapproved in *Zeth S.*, *supra*, 31 Cal.4th at pages 413-414.

13.

We find *Brian P.* wholly distinguishable on a critical fact, namely the juvenile court did not have the benefit of an adoption assessment report, which the appellate court stated "would have presented the kind of facts needed to support a finding of adoptability." (*Id.* at p. 624.) In this case, the juvenile court had an adoption assessment report, which provided sufficient evidence for it to determine William's adoptability.

Mother argues we must scrutinize the suitability of a prospective adoptive parent when the child is deemed specifically adoptable due to a caretaker's desire to adopt. The case mother primarily relies on for this assertion, *In re Carl R.* (2005) 128 Cal.App.4th 1051 (*Carl R.*), is so factually distinguishable from the instant case as to be of little factual or legal significance. In *Carl R.,* the minor, who was approximately eight years old but had the emotional maturity of an eight-month-old infant, suffered severe disabilities that would *always* require total care and had lived most of his life in a convalescent hospital. (*Id.* at p. 1058.) At trial, the juvenile court confronted competing claims over whether he should be freed for adoption by a family who would home school him. The appellate issue was "very narrow—what is the proper scope of the inquiry by the juvenile court in determining the adoptability of a child who will require intensive care for life?" (*Id.* at p. 1062.) In resolving the issue, the appellate court observed that, where such a child is deemed adoptable based solely on the fact that a particular family is willing to adopt him or her, the trial court must consider whether the family can meet the child's particular needs. (*Ibid.*) The court concluded the juvenile court sufficiently assessed the prospective adoptive parents' ability to meet the child's educational needs; therefore, an inquiry into their specific educational plan was unwarranted. (*Id.* at pp. 1063-1065.)

In contrast here, while William does have special needs, medically and developmentally, they will not require intensive care for life. Accordingly, *Carl R.* does not compel a different result.

14.

Mother's reliance on *Jerome D.* and *Jayson T.* also is misplaced. In *Jerome D.*, the appellate court reversed an adoptability finding that it determined was based on the willingness of the child's stepfather to adopt him. (*Jerome D.*, *supra*, 84 Cal.App.4th at p. 1205.) The court held such evidence was insufficient because the adoption assessment failed to address the stepfather's criminal and child-protective-services histories as required by section 366.22, subdivision (c)(1)(D) (formerly § 366.22, subd. (b)(4)). (*Jerome D.*, *supra*, at p. 1205.) While mother asserts *Jayson T.* stands for the proposition that adoptability should not be based solely on a caretaker's willingness to adopt, the court in that case did not identify any specific evidence that must be adduced before a juvenile court finds a child adoptable. Rather, *Jayson T.* held that, where the adoptive placement fails during the pendency of an appeal, appellate counsel for the minors can raise the issue that the children are not adoptable. (*Jayson T.*, *supra*, 97 Cal.App.4th at pp. 87-91.) *Jayson T.* has been disapproved on this point. (*Zeth S.*, *supra*, 31 Cal.4th at pp. 413-414.)

Based on these cases, mother asks us to entertain the possibility that the relatives may not adopt William. However, this would require us to engage in speculation. We prefer the more commonsensical view that, "when there is a prospective adoptive home in which the child is already living, and the only indications are that, if matters continue, the child will be adopted into that home, adoptability is established. In such a case, the literal language of the statute is satisfied, because 'it is likely' that that particular child will be adopted." (*Jayson T.*, *supra*, 97 Cal.App.4th at p. 85.)

For all the reasons stated above, we conclude substantial evidence supports the juvenile court's adoptability finding.

## *DISPOSITION*

The judgment is affirmed.

_____

Smith, J.

WE CONCUR:

_____

Poochigian, Acting P.J.

_____

Peña, J.